UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x
                               :

LUMMUS TECHNOLOGY HEAT TRANSFER   :   Case No. <u>22-CV-4025</u>
B.V.                                  :

                        Plaintiff,    :   **COMPLAINT**

                                 :

     v.                              :

                                 :

                                 :

CREDIT AGRICOLE CORPORATE INVESTMENT:
BANK, and LLC KIRISHINEFTEORGSINTEZ   :

                                ::

                    Defendants.    :
– – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

Plaintiff Lummus Technology Heat Transfer B.V. ("Lummus"), by its attorneys K&L Gates LLP, for its complaint against defendants Credit Agricole Corporate Investment Bank ("Credit Agricole"), and LLC Kirishinefteorgsintez ("Kinef") alleges as follows:

## NATURE OF THE ACTION[1]

1.      This dispute arises out of Kinef's improper and fraudulent demand for payment of EUR 5,116,800.00 from Credit Agricole under a standby letter of credit obtained by Lummus to secure an advance payment made by Kinef pursuant to a contract for the supply of certain equipment entered into between Lummus and Kinef on June 21, 2021 (the "Agreement"). Specifically, in order to demand payment, Kinef was required to represent, in writing, that: (1) Lummus breached its obligations under the Agreement; (2) the draw was being made in accordance with the terms of the Agreement; (3) Lummus owed Kinef the money; and (4) Lummus remained in default under the Agreement at the time of Kinef's demand. Each and every one of these representations were knowingly false when Kinef made them. Lummus is not, and has never been, in default under the Agreement, as Kinef effectively admitted in writing prior to making its fraudulent demand.

2.      Since entering into the Agreement, Lummus fully performed its contractual obligations and, by March 2022, Lummus had completed roughly 30% of its overall scope of work. Given the long lead times for certain equipment, however, the parties understood that the delivery window for the equipment would not begin until November 2022 at the earliest.

3.      On February 24, 2022, Russia launched a large-scale invasion of Ukraine.  In response, the European Union ("EU") and the United States ("US") began to issue sanctions

---

[1] A true and correct copy of the Agreement is attached as Exhibit A to the declaration of Todd Kramers. For a full recitation of the facts and relevant documents, the Court is respectfully referred to Mr. Kramers' declaration, including all exhibits attached thereto, all of which are submitted herewith in support of this Complaint and the Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction.

against Russia, as well as entities and individuals with close ties to the government.  Of particular relevance here, on February 25, 2022, the EU imposed sanctions that would, as of May 27, 2022, prevent Lummus' further performance under Agreement.

4.      In the Agreement, the parties specifically agreed that sanctions preventing Lummus' performance under the Agreement would be considered a force majeure event.  Notably, though, such a force majeure event would not require termination of the Agreement.  Instead, the parties expressly agreed that, in such a situation, Lummus would have the ability to extend the delivery schedule for the equipment.  The Agreement further required Lummus to extend the standby letter of credit, if necessary.

5.      Importantly, Kinef agreed that the February 25, 2022 EU sanctions constituted a force majeure event under the Agreement.  Kinef admitted as much in writing.  In other words, Kinef acknowledged that Lummus' continued performance would be prevented by the EU sanctions and was not as the result of any default under the Agreement within Lummus' control.

6.      Pursuant the Agreement, Lummus informed Kinef that it was not terminating the Agreement, that Lummus would continue to perform until May 27, 2022 (the date on which the new sanctions would prevent further performance), and requested the parties confer as to the scope of work that should be completed before then, as well as the most efficient way to resume work once the sanctions were lifted.

7.      In response to Lummus' good faith efforts to abide by the terms of the Agreement, Kinef did the opposite—Kinef demanded that Lummus terminate its performance, return the already-spent advance payment, and threatened to call the entire amount of the standby letter of credit if Lummus did not return the advance payment.

8.      On or about May 6, 2022, Kinef made good on its threat and fraudulently demanded payment of the standby letter of credit.  Under the terms of the letter of credit, Credit Agricole will be required to make payment on or about May 19, 2022.

9.      Accordingly, Lummus is entitled to a declaration, a temporary restraining order, a preliminary injunction, and such other relief as the Court deems appropriate.

## PARTIES

10.      Plaintiff Lummus Technology Heat Transfer B.V. is a *besloten vennootschap*, or private limited company, organized under the laws of the Netherlands, with its principal place of business in The Hague, The Netherlands.

11.      Upon information and belief, defendant Credit Agricole Corporate Investment Bank is a corporation authorized to do business in the State of New York, with its place of business located at 1301 Avenue of the Americas, New York, New York.

12.      Upon information and belief, defendant LLC Kirishinefteorgsintez is a corporation organized and existing under the laws of Russia, with a principal place of business in Kirishi, Leningrad Oblast, Russia.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C § 1332(a)(2) because the dispute is between citizens of a State and citizens of foreign states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.      Jurisdiction is proper under N.Y. C.P.L.R. 301 and 302 because: (i) Credit Agricole consented to the personal jurisdiction of this Court by registering their New York branch, agency, or representative office with the New York State Department of Financial Services under New York Banking Law §§ 200 and 200-b(2)(e); (ii) this action arises out of Credit Agricole's and

Kinef's transaction of business within the state of New York; and (iii) this action arises out of Kinef's fraudulent actions within the state of New York.

15.     Venue is proper under 28 U.S.C § 1332(b)(2) because it is the district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. Venue is further proper because, upon information and belief, the principal offices of Credit Agricole are located in New York County.

## FACTUAL ALLEGATIONS

### A.     The Parties Enter Into the Agreement

16.     Lummus and Kinef entered into the Agreement on June 21, 2021.

17.     Pursuant to the Agreement, Lummus would engineer and design, manufacture, and deliver certain "Equipment," as defined by and in accordance with technical specifications provided in the Agreement.  Agreement, § 2.1.

18.     The parties agreed that Lummus would deliver the Equipment between 16 and 22 months after Kinef provided an initial, advance payment.  Agreement, § 10.1.  In other words, the parties contemplated that delivery of Equipment would not begin until late November 2022, at the earliest.

### B.     The Advance Payment and Standby Letter of Credit

19.     The Agreement required Kinef to make an advance payment to Lummus of EUR 5,116,800.00. Agreement, §§ 8.1-8.1.1.

20.     In exchange, Lummus was required to obtain a corresponding EUR 5,116,800.00 standby letter of credit (the "Standby LC") to secure advance payment made by Kinef.  Agreement, § 8.3.

21.     Lummus obtained the Standby LC from Credit Agricole on or about September 20, 2021.  The expiration date of the Standby LC was and remains July 20, 2023.

4

22.   The Standby LC expressly referenced the Agreement and required Kinef to make certain representations to Credit Agricole in order to demand payment.  First, Kinef was required to state "that [Lummus] has failed to fulfill its obligations under the [Agreement] and indicating in which respect."  Second, that the draw was "being made in accordance with the terms and conditions of the Agreement."  Third, that Kinef provided Lummus 20 days' notice of its intent to make the draw as a result of Lummus' default.  And, fourth, that Lummus "remains in default at the time of the drawing."

### C.   The Force Majeure Provisions

23.   The Agreement included a force majeure provision that specifically contemplated the issuance of sanctions that would hinder the ability of the parties to perform under the Agreement. Specifically, Section 16.1 defined "Force Majeure" as follows:

> "Force majeure" means an occurrence of the circumstances beyond the reasonable control of the Parties which have not been foreseen at the Effective Date and which prevent the performance by the Parties of their contractual obligations within the contractual terms or prevent their performance entirely, such as listed below (but not limited to): acts of God, pandemic, epidemic, ***sanctions***, embargoes, natural disasters, extreme weather conditions, wars, official strikes (excluding strikes or lockouts or other industrial disputes or actions of the Supplier's employees), ***action*** or inaction ***of the government, rules and regulations of state bodies*** having the appropriate powers, claims of which make fulfillment of contractual obligations of the Party and/or the both Parties impossible.

Agreement, § 16.1 (emphasis added).

24.   The occurrence of a force majeure did not terminate the Agreement.  Instead, the parties agreed that a force majeure event would suspend the party's obligations during the period the force majeure was in effect.  Agreement, § 16.5.

25.   The Agreement expressly stated that, in the event of a force majeure, Lummus would have the right to extend the period for the delivery of the Equipment.  It further provided

that the parties would amend the relevant letters of credit under the Agreement to the extent

necessary.  Specifically, Section 16.6 of the Agreement provided:

> In case of Force majeure ***the Supplier shall have a right to extend the period of the Equipment delivery*** and validity of the Letters of Credit issued by Customer. If not otherwise agreed upon by the Parties in writing, the Customer shall amend the letters of credit as per the meaning of the present Article 16 not later than 21 (twenty one) calendar days from the date of the respective Supplier's notice . . . .  If not otherwise agreed upon by the Parties in writing, the Supplier shall amend Standby Letter of as per the meaning of the present Article 16 not later than 21 (twenty one) calendar days from the date of the respective Customer's notice. . . .

Agreement, § 16.6 (emphasis added).

### D.     Additional Sanction Provisions

26.     The Agreement provided other provisions that specified the parties' respective

rights in the event of newly-issued sanctions.

27.     For example, in Section 20.5 the parties acknowledged that Lummus' work under

the Agreement would not be in contravention of then-in-force EU and US sanctions precluding the

provision of certain goods and services to Kinef.

28.     In the same provision, Kinef acknowledged that Lummus would be required to

abide by all laws and regulations of the EU and the US.  Lummus, in turn, agreed to notify Kinef

if newly-issued EU or US sanctions prevented Lummus from continuing its performance under

the Agreement.  Specifically, Section 20.5 provided:

> The Parties acknowledge that the Supplier is legally required to comply with all laws that apply to it and its business including those related to US and EU sanctions against Russia and certain Russia entities (hereinafter – Trade Restrictions).  In the event that any newly enforced Trade Restriction makes impossible for the Parties to perform their obligation under the Contract in time and/or in full cope including but not limited to acceptance of and payment for Equipment, reimbursement of losses cause, penalties and other payments, submission of documents and data, the Supplier promptly informs the Customer in writing by fax or email of contents of Trade

>Restriction, its effective date and other circumstances substantial for performance of the Contract.

Agreement, § 20.5.

29.     Finally, Kinef expressly agreed in Section 20.5 that "in the event that [Lummus], believes it must terminate this Contract in order to comply with sanctions laws, the Parties agree that [Lummus] may do so without penalty. . . ."  In the event that Lummus did terminate the Agreement as a result of new sanctions, Kinef further agreed to confer with Lummus and pay for Equipment and work undertaken.  *See* Agreement, § 20.5.

30.     In summary, the Agreement could not be clearer as to Lummus' rights and obligations in the event of newly-imposed EU sanctions that would prevent Lummus' performance of its contractual obligations.  First, such an event would constitute a force majeure event, excusing Lummus' performance during the period the sanctions were in effect.  Second, Lummus could determine whether the sanctions require Lummus to terminate the contract and, if Lummus so determined, it could cancel the Agreement without penalty and still be compensated for the Equipment and work undertaken.  Third, if Lummus determined the sanctions did not require termination, Lummus could extend the delivery period for the Equipment as required and the parties agreed to amend and extend the letters of credit under the Agreement as necessary.

31.     The occurrence of such sanctions, however, could not constitute an event of default by Lummus.  Nor did the Agreement provide Kinef with the ability to force Lummus to terminate the Agreement.  And it certainly did not provide Kinef the right to draw on the Standby LC under these circumstances.

E.      **The EU Issues New Sanctions And Kinef Wrongfully Threatens To Draw On The Standby LC**

32.     On February 24, 2022, Russia launched a large-scale invasion of Ukraine.  In response, the EU and the US began to issue sanctions against Russia, as well as entities and individuals with close ties to the Russian government.

33.     On February 25, 2022, the EU adopted EU Regulation 2022/328 in response to Russian military aggression against Ukraine.[2]  EU Regulation 2022/328 amends EU Regulation 833/2014 to prohibit the sale, supply, transfer or export of "goods and technology suited for use in oil refining and liquefaction of natural gas . . . , whether or not originating in the [EU], to any natural or legal person, entity or body in Russia or for use in Russia."  EU Regulation 2022/328 also amends EU Regulation 833/2014 to prohibit the provision of "technical assistance" and the "manufacture" and "maintenance" of those same goods and technology.

34.     Annex X of EU Regulation 833/2014 (as amended by Annex IX of Council Regulation (EU) 2022/328) specifically lists the Equipment that Kinef contracted to purchase from Lummus under the Agreement—"Delayed cokers"— among the "goods and technology" subject to the new sanctions.

35.     Because the Agreement was signed before February 26, 2022, the prohibitions imposed by EU Regulation 2022/328 go into effect on May 27, 2022.

36.     On March 3, 2022, Lummus sent Kinef a letter notifying Kinef of the EU Regulation 2022/328, and that it constituted a force majeure event under Section 16 of the Agreement.  The March 3, 2022 letter further stated:  "Rest assured that LHT is not interested in terminating this contract, but rather first wishes to explore alternative ways in compliance with the

---

[2] A true and correct copy of EU Regulation 2022/328 is attached as Exhibit C to the Kramers Dec.

applicable laws and regulations to support KINEF with this project and hopefully achieve a successful completion."

37.     On March 24, 2022, Kinef agreed that EU Regulation 2022/328 constituted a force majeure event.  In this letter, Kinef acknowledged that "the trade restrictions stipulated by the Regulation make impossible performing by Lummus Technology Heat Transfer B.V. of its obligations established by the Contract . . . ."  At the same time, however, Kinef falsely claimed that the sanctions somehow constituted a "default" by Lummus and wrongfully demanded that Lummus terminate its performance and return the advance payment of EUR 5,116,800.00.  Kinef further threatened to demand payment from Credit Agricole of the entire Standby LC in 20 days if Lummus did not capitulate to Kinef's demands.

38.     Later that same day, Lummus responded via letter.  Lummus assured Kinef that it was continuing to perform its obligations under the Agreement, and would continue to perform those obligations until EU Regulation 2022/328 took effect on May 27, 2022.  Lummus explained that the newly-issued sanctions were a force majeure event that did not require termination of the Agreement.  Instead, as Lummus noted, Lummus could extend the delivery period for the equipment, which, as of that date, did not require delivery until between November 2022 and May 2023.  Lummus further pointed out that it had already undertaken significant work under the Agreement over the last six months, having achieved nearly 30% of completion of the project scope by the end of February 2022.  Lummus explained that, under the plain terms of the Agreement, Kinef had no entitlement to return of the advance payment or to demand payment under the Standby LC.  Finally, Lummus reiterated that it "remains committed to the project and looks forward to working with Kinef to a successful completion once circumstances permit it."

39.     Kinef responded to Lummus' letter on March 31, 2022.  In its letter, Kinef specifically agreed that the sanctions were a force majeure event under the Agreement, but wrongly claimed that "the force majeure event exempts from liability, LLC 'KINEF' is not obliged to reimburse [Lummus] any costs and expenses incurred in performance of the Contract."  Though directly contrary to terms of the Agreement, Kinef asserted it considered it "reasonable . . . to demand for return of an advance payment and possibly to apply to the bank for drawing the monetary means from the standby letter of credit."

40.     On April 1, 2022, Lummus responded to Kinef's March 31 letter.  In its letter, Lummus again explained that it was not required to terminate the Agreement, that Lummus had continued to perform its obligations, and that it would continue to perform until May 27, 2022, when the EU Sanctions, constituting a force majeure event, would prevent continued performance. Lummus further noted that, under the express terms of the Agreement, the delivery schedule for the equipment would be extended and that the parties would need to agree to a new schedule when there was more clarity on when the sanctions may be lifted.  Finally, Lummus reiterated that nothing in the Agreement entitled Kinef to a return of the advance payment or to demand payment under the Standby LC.

41.     On April 5, 2022, Kinef yet again conceded that EU Regulation 2022/328 was a force majeure event.  Specifically, Kinef stated that "in the event of force majeure the parties of the contract are not liable to each other for non-performance or improper performance of the obligations" and that the "impossibility of execution of [the Agreement]" resulted "from the introduction of trade restrictions by the European Union on the basis of Article 3(b) and Annex X to EU Regulation 2022/328 . . . ."  Kinef again, however, threated to draw on the Standby LC.

42.     On April 11, 2022, Lummus yet again assured Kinef that it was continuing to perform under the Agreement, that Lummus "is neither interested in termination of the Contract with KINEF, nor is LHT required by the sanctions to terminate the Contract" and that Lummus "remains committed to supporting KINEF to find a way to proceed with project execution once the Force Majeure event ends."  Lummus further reminded Kinef that the Standby LC remained valid until June 20, 2023, ensuring Kinef remained secured against its advance payment, and that Lummus would extend the Standby LC if the new delivery schedule required it.  Lummus reiterated that Kinef's threats to draw on the Standby LC at that time was "without a contractual basis."

43.     As set forth above, Kinef repeatedly admitted in its correspondence that EU Regulation 2022/328 constituted a force majeure event under the Agreement, that it was "beyond the control" of the parties.

**F.      Kinef Fraudulently Demands Payment of the Standby LC**

44.     On or about May 6, 2022, Kinef demanded payment of the entire EUR 5,116,800.00 from Credit Agricole under the Standby LC through CA Indosuez. On or about May 12, 2022, Credit Agricole received notice of Kinef's demand.

45.     As set forth above, the Standby LC required Kinef to make the following representations to Credit Agricole in order to demand payment.  First, Kinef was required to state "that [Lummus] has failed to fulfill its obligations under the [Agreement] and indicating in which respect."  Second, that the draw was "being made in accordance with the terms and conditions of the Agreement."  Third, that Kinef provided Lummus 20 days' notice of its intent to make the draw as a result of Lummus' default. And, fourth, that Lummus "remains in default at the time of the drawing."

46.     As also set forth above, Kinef knew that it could not truthfully make these representations because it had repeatedly admitted in its correspondence with Lummus that EU Regulation 2022/328 constituted a force majeure event under the Agreement.

47.     In addition, Kinef knew that it could not make these representations because Lummus repeatedly confirmed that it was performing and would continue to be performing until EU Regulation 2022/328 took effect on May 27, 2022.

48.     Kinef's representation in its Standby LC demand that Lummus failed to fulfill its obligations under the Agreement was false, and Kinef knew, or should have known, it was false when made.

49.     Kinef's representation in its Standby LC demand that its demand was in accordance with the terms and conditions of the Agreement was false, and Kinef knew, or should have known, it was false when made.

50.     Kinef's representation in its Standby LC demand that it was owed EUR 5,116,800.00 due to Lummus' default under the Agreement was false, and Kinef knew, or should have known, it was false when made.

51.     Kinef's representation in its Standby LC demand that Lummus remained in default under the Agreement at the time Kinef made the demand was false, and Kinef knew, or should have known, it was false when made.

## G.     Immediate And Irreparable Harm

52.     Kinef's demand for payment under the Standby LC was made to Credit Agricole on or about May 12, 2022.  Pursuant the terms of the Standby LC, Credit Agricole has 5 business days to make payment to Kinef's chosen bank.

53.     Absent the issuance of a temporary restraining order and preliminary injunction, Lummus will suffer immediate and irreparable harm if Kinef is allowed to wrongfully draw on the Standby LC.

54.     If Kinef is permitted to draw on the Standby LC, Lummus will suffer irreparable harm in losing an unquantifiable amount of future business, in losing competitive advantage, and in suffering incalculable damage to the goodwill that Lummus has built in the industry among its many loyal customers and through its many years in business.  Lummus will suffer such irreparable harm, because it will no longer be able to represent that it has not had letters of credit or bonds drawn on past projects.  In the full service engineering, procurement, and construction industry, contracts are awarded through a bidding process that almost always requires the contractor to represent whether it has ever had letters of credit or bonds pulled on prior projects.  To date, Lummus has been able to answer those inquiries in the negative, the preferred and often required answer for contract awards on large projects.  If Kinef's draw is permitted to go forward, Lummus will have to answer in the affirmative and, as a result, will either be disqualified from bidding, be deemed to have lost the bidding process, or be subject to less favorable commercial terms.

55.     Moreover, as a result of the geopolitical turmoil in Russia, it is unlikely that Lummus would have any meaningful judicial recourse or the ability to recover the Standby LC once it has been received by Kinef.

## CAUSES OF ACTION

### AS AND FOR THE FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT

56.     Lummus repeats and re-alleges paragraphs 1 through 55 hereof, as if fully set forth herein.

57.     As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of unenforceability.

58.     Lummus has complied with all of the terms, and have performed all of its obligations, under the Agreement.

59.     Kinef had no entitlement to demand payment of the Standby LC under the terms of the Agreement and the Standby LC.

60.     Kinef's demand on the Standby LC knowingly contains misrepresentations and is contrary to the terms and provisions of the Agreement and the Standby LC.

61.     Accordingly, Lummus is entitled to a judgment declaring that Kinef is not entitled to draw on the Standby LC.

## AS AND FOR THE SECOND CAUSE OF ACTION

## INJUNCTION AND RESTRAINING ORDER PURSUANT TO F.R.C.P. 65

62.     Lummus repeats and re-alleges paragraphs 1 through 61 hereof, as if fully set forth herein.

63.     Credit Agricole should be preliminarily and permanently enjoined from making payment to Kinef pursuant to Kinef's wrongful demand on the Standby LC.

64.     Lummus has no adequate remedy at law.

65.     Lummus has and will suffer immediate and irreparable injury absent a temporary restraining order and injunctive relief.

66.     On the other hand, Kinef will not suffer any harm if the Agreement is enforced and status quo maintained.

67.     As such, the balance of equities here tips decidedly in Lummus' favor.

68.     The public interest will not be harmed by the issuance of such relief.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff Lummus Technology Heat Transfer B.V. respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

a. Declaring pursuant to 28 U.S.C. § 2201 that defendant Kinef is not entitled to draw on the Standby LC;

b. Issuing an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure preliminarily and permanently enjoining defendant Credit Agricole from making payment to Kinef pursuant to Kinef's demand on the Standby LC; and

c. Granting such other and further relief as the Court may deem just and proper, including but not limited to reasonable attorneys' fees, interest, costs, and disbursements.

Dated: May 17, 2022

By: */s/ Kodey M. Haddox*

Kodey M. Haddox
  kodey.haddox@klgates.com
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
Telephone: 212.536.3900

Thomas F. Holt, Jr. (*pro hac vice forthcoming*)
  thomas.holt@klgates.com
Christopher J. Valente (*pro hac vice forthcoming*)
  christopher.valente@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone: 617.261.3100

ATTORNEYS FOR PLAINTIFF LUMMUS TECHNOLOGY HEAT TRANSFER B.V.